UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Demetrais Miller, *et al.*,

    Plaintiffs,

v.

Lavern Lowe, *et al.*,

    Defendants.

Case No. 2:04cv1027

Judge Michael H. Watson

## OPINION AND ORDER

This case concerns the tragic death of nineteen-month-old Demetre A. Miller at the hands of a certified daycare provider, Lavern Lowe. Plaintiffs assert a claim under 42 U.S.C. § 1983, arguing defendants violated substantive due process by re-certifying the daycare provider despite a pending charge of domestic violence and assault against the provider and accusations that she had abused and neglected children in her care. Plaintiffs also bring state law claims for wrongful death and survivorship. This matter is before the Court on motion for summary judgment of defendants Franklin County Commissioners Dewey Stokes, Arlene Shoemaker, Mary Jo Kilroy and Paula Brooks, the Franklin County Department of Jobs and Family Services ("FCDJFS"), Mary Lou Langenhop, Christin LeMaster and Claudia Covington (collectively, "defendants"). For the reasons that follow, the Court grants defendants' summary judgment motion.

## I. Facts

### A. Parties

Plaintiffs Demetrais and Mariellen Miller are individual citizens of the State of Ohio. They are the father and mother of plaintiffs' decedent, Demetre A. Miller, and bring this action on their own behalf and as co-administrators of Demetre's estate.

Lavern Lowe is also an individual citizen of the State of Ohio. Lowe killed Demetre. At the time, Lowe was a certified Professional Type B daycare provider.

Defendants Dewey Stokes, Mary Jo Kilroy and Paula Brooks are present members of the Franklin County, Ohio Board of Commissioners ("Board"). Defendant Arlene Shoemaker was a member of the Board when the actions giving rise to this lawsuit took place. Plaintiffs sue the Board members in both their individual and official capacities.

Defendant Mary Lou Lanngenhop is the Director of the Franklin County Department of Job and Family Services ("FCDJFS"). Defendants Claudia Covington and Christin LeMaster are employees of FCDJFS. Plaintiffs also sue these three defendants in both their individual and official capacities.[1]

### B. Certification of providers

FCDJFS certifies Professional Type B daycare providers. Type B providers offer daycare services in their own homes. Type B providers are allowed to care for no more than six children at one time, only three of which may be less than two years old. A provider must be certified to be subsidized through public funding.

---

[1] Plaintiffs have indicated they intend to dismiss the Franklin County Children's Services ("FCCS") defendants. Pl. Mem. In Op. (Doc. 66) at i.

Ohio law places much of the responsibility for certifying daycare providers on county departments of human services, such as FCDJFS. As part of the current process, the prospective provider must submit a BCII criminal records check form and standard fingerprint impression sheet. When Lowe was initially certified, however, the requirements were different. At that time, an applicant was required to be eighteen years of age or older, provide three favorable references, submit a form called a child day care non-conviction statement, and have six months experience or thirty hours of training. Beginning in 1993, FCDJFS was allowed to perform BCII checks of applicants through the Ohio Attorney General. Lowe, however, had already been certified. The law grandfathered in providers who had already been certified, and prohibited BCII record checks on those individuals.

Under Ohio law, a Type B provider's certification is valid for twelve months. Ohio law requires Type B providers to be re-certified at the end of each twelve-month period. To be re-certified, a provider must be in compliance with the requirements of Ohio law. If the provider "remains in compliance," FCDJFS renews the provider's certificate. In 2002, FCDJFS did not perform yearly BCII criminal records checks on providers prior to re-certification.

After a provider is certified, certification specialists perform inspections of the provider's home twice a year to ensure compliance. FCDJFS does not, however, investigate allegations of abuse by providers. All allegations of abuse are referred to Franklin County Children's Services ("FCCS") for investigation. FCDJFS's policy is that it will act on an allegation of abuse only after it receives a disposition or "results" letter from FCCS stating the allegation of abuse was substantiated. McCauley Dep. at 56, 87.

A disposition letter sets forth one of three possible findings: substantiated, unsubstantiated, and indicated. An allegation of abuse is deemed substantiated when the investigation uncovers evidence substantiating or corroborating the allegation of abuse. *Id.* at 67. An allegation is unsubstantiated when there are no third-party witnesses or other corroborating evidence to confirm the abuse. *Id.* "Indicated" means the investigator has a gut feeling abuse had occurred, but cannot substantiate or corroborate the abuse. *Id.*

### Lowe's prior conduct

In 1997, Lowe's husband called Claudia Covington at FCDJFS and reported that Lowe hit and threatened children in her care, and that a child died while in her care in 1989. Covington spoke with her supervisor, who agreed Covington should interview Lowe about the allegations. Lowe told Covington that a child had not died in her care during the time she was a certified provider. Lowe also averred she and her husband were going through a divorce and custody battle, and he was engaging in character assassination. Covington reviewed Lowe's file but found no support for Lowe's husband's claims. Covington took no further action. FCCS was contacted about the allegations. McCauley Dep. at 83-84.

On July 9, 2001, Lowe was reported to FCCS for "improper discipline."

On May 20, 2002, FCCS sent a disposition letter to FCDJFS concerning an allegation of physical abuse by Lowe of children in her care. FCCS found the allegation of abuse to be unsubstantiated, but stated neglect was indicated.

On May 2, 2002, Lowe was charged with domestic violence and assault against a minor who lived in her home for hitting the child on the back with a plastic spoon with

enough force to leave bruises. Under the applicable administrative code provision, pending charges of this nature would preclude re-certification. At the time, however, FCDJFS did not perform annual criminal record checks on providers, and in fact did not perform such checks after the provider was initially certified. LeMaster Dep. at 53-54. There was no mechanism in place whereby FCDJFS would automatically receive notification of the filing of criminal charges against a provider it had certified. McCauley Dep. at 40. FCDJFS was therefore unaware of the pending criminal charges when it re-certified Lowe. McCauley Dep. at 55.

FCCS investigated the spoon-hitting incident. On April 2, 2002, FCCS verbally informed FCDJFS that Lowe admitted to hitting a child with a plastic spoon, leaving bruises on the child's back. At some point before Lowe was re-certified, FCDJFS learned that FCCS had substantiated the abuse, but that knowledge did not come by way of a disposition letter. FCDJFS's policy required receipt of the FCCS disposition letter before action would be taken. McCauley Dep. at 56, 87. FCCS would not send written confirmation because the victim was not in subsidized care. FCCS required a release from Lowe before it would send FCDJFS the disposition letter. During a visit to Lowe's daycare on May 21, 2002, LeMaster attempted to obtain a copy of the disposition letter directly from Lowe, but Lowe did not provide the letter or release. On June 26, 2002, LeMaster and McCauley sent Lowe a letter instructing her to provide the letter or the signed release, and warning her that if she did not she would be "considered uncooperative with an investigation and be dealt with as state rules require." Lowe eventually signed the release, but FCDJFS either never received the letter from FCCS, or received it after Demetre died. LeMaster Dep. at 88; McCauley Dep. at 105.

In late June or early July 2002, FCDJFS re-certified Lowe as a Professional Type B provider.

### D. Demetre's death

In May 2001, plaintiffs requested from FCDJFS a list of certified Professional Type B providers. Plaintiff Mariellen Miller was concerned about leaving her children with a provider because they were young and had never been in child care. Ms. Miller asserts she relied on FCDJFS's approval, and worked with FCDJFS to select defendant Lowe, who was located near plaintiffs' home. Plaintiffs placed three of their children in Lowe's daycare, including Demetre.

On the evening of September 15, 2002, Ms. Miller took two of her children, Mikelquale and Demetre, to Lowe's house to spend the night because Lowe was also having other children from her daycare spend the night. The next afternoon, Ms. Miller arrived at Lowe's home and found Demetre lying on the floor. Lowe had called for medics, but they had not yet arrived. Demetre died on September 19, 2002 as a result of injuries he sustained while in Lowe's care.

Lowe was charged with one count of murder, one count of felonious assault, two counts of endangering children, and one count of involuntary manslaughter. At trial, Lowe admitted shaking Demetre, but said she did so after finding him lying between two playground slides. Lowe was convicted of one count of endangering children and one count of involuntary manslaughter. The state appellate court upheld her conviction. *State v. Lowe,* 164 Ohio App.3d 726, 843 N.E.2d 1243 (2005).

This action followed.

## II. Summary Judgment

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000). The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris,* 260 F.3d 654, 665 (6th Cir. 2001).

### III. Discussion

### A. Qualified immunity

The individual defendants contend they are entitled to qualified immunity with respect to plaintiffs' claims against them in their individual capacities. Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Conn v. Gabbert*, 525 U.S. 286, 290 (1999) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (*quoting* Harlow, 457 U.S. at 806)).

In determining whether a public official is shielded from liability under the doctrine of qualified immunity, the Sixth Circuit Court of Appeals typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Sixth Circuit occasionally considers a third step in the qualified immunity, inquiring as to "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter*, 408 F.3d at 310 n. 2.

To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the U.S. Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits. *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996). "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right." *Sheets*, 97 F.3d at 166. "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

The Court will proceed to examine whether plaintiffs can demonstrate a constitutional violation.

### B. Constitutional violation

#### 1. State Actor

Plaintiffs assert defendants' re-certification of Lowe violated substantive due process. Plaintiffs also contend Lowe was acting under color of state law when Demetre received the injuries that led to his death.

42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

> privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, . . .

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985). To prevail on a claim under § 1983, a plaintiff must prove: (1) a person, (2) acting under color of state law, (3) deprived him of a federal right. *Tanner v. County of Lenawee,* 452 F.3d 472, 477-78 (6th Cir. 2006).

"It goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.'" *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998)(*quoting Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987) (en banc)). Plaintiffs have therefore established one element of their §1983 claim, the deprivation of a right secured by the Constitution or laws of the United States. At issue is whether Lowe was acting under color of state law.

A private individual acts under color of state law when her conduct is "fairly attributable to the state." *Lugar v. Edmundson Oil Co.,* 457 U.S. 922, 947 (1982). Courts employ three tests to determine whether a private party is a state actor: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test. *Romanski v. Detriot Entertainment, L.L.C.,* 428 F.3d 629, 636 (6th Cir. 2006).

Plaintiffs argue Lowe was a state actor under the nexus test. Plaintiffs maintain Lowe was acting under color of state law because defendants contracted with, paid, and monitored Lowe pursuant to state statutes and regulations.

The inquiry for the nexus test is whether there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself. *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992). Receipt of substantial public funds does not render a private party a state actor. *Id.* at 1336. Moreover, even extensive and detailed state regulation of a private entity does not support a finding of state action. *Id.* "Rather, to show state action, the complaining party must demonstrate a sufficient nexus between the challenged action and the regulatory scheme alleged to be the impetus behind the private action." *Id.*

That FCDJFS contracted with, paid and monitored Lowe pursuant to state statutes and regulations does not give rise to the kind of symbiotic relationship that would render Lowe a state actor. Extensive regulation and receipt of public funds does not satisfy the nexus test. *Id.* Moreover, defendants' monitoring of Lowe consisted of an initial screening and two visits per year to determine compliance. In the regulatory scheme, defendants were not charged with the duty to investigate allegations of abuse; that task fell to FCCP.

The Court finds that defendants' degree of involvement with Lowe's daycare was too limited to support a finding that Demetre's death was a state action. For this reason, the Court concludes plaintiffs' assertion that Lowe was a state actor to be without merit as a matter of law.

### 2. State created danger

As an alternative basis for recovery under § 1983, plaintiffs argue defendants may be held liable under the state created danger theory. Analysis of the state created

danger doctrine properly begins with *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989). In *DeShaney*, the mother of a child who had been severely beaten by his father asserted a substantive due process claim against social workers who failed to remove the child from his father's custody despite knowledge that the father was abusive. The Court upheld the trial court's decision granting summary judgment in favor of the social workers, holding "the state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney,* 489 U.S. at 197. The Court recognized an exception to this rule, however, noting "when the State takes a person into its custody against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200.

Since *DeShaney,* federal appellate courts, including the Sixth Circuit, have carved out a second exception to the rule – the "state created danger" theory. *See Kallstrom,* 136 F.3d at 1066 (citing cases). In *Kallstrom,* the court opined the *DeShaney* Court left open the possibility that the state may be liable for private acts which violate constitutionally protected rights despite the absence of a special relationship. The Court in *DeShaney* stated, "while the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" 489 U.S. at 201 (emphasis added). Based on this language, the Sixth Circuit reasoned, "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts." *Kallstrom*, 136 F.3d at 1066. Liability under the state created

danger exception arises when affirmative acts of the state create or increase the risk of exposing an individual to private acts of violence, which do not affect the general public. Id.

To succeed on a state created danger claim, a plaintiff must prove:

1. an affirmative act by the state which either created or increased the risk that the plaintiff's decedent would be exposed to an act of violence by a third party;

2. a special danger to the to the decedent wherein the state's actions placed the decedent specifically at risk, as opposed to a risk affecting the public at large; and

3. the state knew or clearly should have known its actions specifically endangered the decedent.

Tanner, 452 F.3d at 478; Jones v. Reynolds, 438 F.3d 685, 690 (6th Cir. 2006).

Plaintiffs contend the act of re-certifying Lowe was an affirmative act for purposes of the state created danger theory. Defendants argue plaintiffs are improperly attempting to equate defendants' failure to attend to reports of abuse and neglect, and their failure to perform a criminal records check, with affirmative acts.

Jones is instructive. In Jones, police officers arrived at the scene of a drag race that was about to begin. Once they saw the officers, the drag racers planned to abandon the race and would not have proceeded with the race if the officers had not told them they could do so. During the race, a car lost control and veered into the crowd, killing a spectator. The district court granted summary judgment in favor of the defendants. The court affirmed, holding in part that the plaintiff could not show an

affirmative act that created the danger to the victim. *Jones,* 438 F.3d at 691. The court stated, "'a failure to act is not an affirmative act under the state-created danger theory.'" *Id.* (quoting *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003). Noting that whether conduct constitutes a failure to act or action is difficult to discern in the abstract, the court observed that in practice, the Sixth Circuit has always treated conduct as inaction when it does not increase the risk of harm posed by the private actor. *Id.* (citing cases). Moreover, the court stated an affirmative act will not be found where the state merely returns a person to a preexisting danger. *Id.* at 693.

Plaintiffs selected Lowe as the daycare provider for three of their children in about May or June 2001. Nicole Miller Aff. ¶ 4; Nicole Miller Dep. at 10, 16. Lowe was re-certified in late June/early July 2002. Demetre died on September 19, 2002 from injuries he received while in Lowe's care on September 15, 2002. Lowe presented the same threat of danger to Demetre before re-certification as she did after re-certification. Re-certification therefore did not increase the risk of harm to Demetre. Hence, defendants in the instant case at most returned Demetre to a preexisting danger by re-certifying Lowe.[2] For this reason, plaintiffs cannot satisfy the affirmative act element of their state created danger claim.

In addition, the re-certification of Lowe does not satisfy the affirmative act element state created danger theory because re-certification did not create an immediate threat of harm with a limited range and duration. *See Ruiz v. McDonnell,* 299 F.3d 1173, 1183

---

[2] The notion that defendants even "returned" Demetre to a preexisting danger is questionable inasmuch as defendants did not place Demetre with Lowe in the first instance. Rather, plaintiffs voluntarily enrolled Demetre in Lowe's daycare. In light of this, it is even more difficult to say defendants created the danger to Demetre by their affirmative acts. *See Jones,* 438 F.3d at 694.

(10th Cir.)(licensing day care provider not an affirmative act), *cert. denied,* 538 U.S. 999 (2002); *Reed v. Knox County Dep't of Human Servs.,* 968 F.Supp. 1212, 1220-22 (S.D.Ohio 1997)(placing violent child in foster home not an affirmative act). In *Ruiz,* the plaintiff, a single working mother receiving federal assistance for daycare expenses, placed her infant son in the Tender Heart Day Care. The infant died as a result of severe head injuries consistent with violent shaking while at Tender Heart.

Tender Heart was licensed by the Colorado Department of Human Services ("CGHS"). At the time, CDHS was required to perform investigations of providers prior to licensing. The plaintiff in *Ruiz* brought a § 1983 action against CGHS under the state created danger theory, asserting that CGHS's failure to uncover an extensive history of domestic violence between Tender Heart's operator and her husband violated her substantive due process rights. The district court dismissed the action.

The Tenth Circuit Court of Appeals affirmed, holding in part that the plaintiff had failed to plead an affirmative act as required under the state created danger theory. *Ruiz,* 299 F.3d at 1183. The *Ruiz* court explained:

> Affirmative conduct for purposes of §1983 should typically involve conduct that imposes an immediate threat of harm, which by its nature has a limited range and duration. *Id.* (quoting *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 733 n. 4 (8th Cir.1993)) (holding that a school district's enrollment of an aggressive student in public school does not constitute the requisite affirmative conduct necessary to maintain a §1983 claim for injuries inflicted by the student because the risk posed by mere enrollment is indefinite). . . .
> Here, the crux of Ms. Ruiz's claim is that J.R. suffered injuries of constitutional proportions because the State Defendants improperly licensed Tender Heart after failing to conduct an investigation into the facility. However, we do not view the mere licensure of Tender Heart as constituting the requisite affirmative conduct necessary to state a viable § 1983 claim. Specifically, the improper licensure did not impose an

> immediate threat of harm. Rather, it presented a threat of an indefinite range and duration.

299 F.3d at 1183.

In the instant case, as in *Ruiz,* the re-certification of Lowe did not create an immediate threat of harm; instead, it posed a threat of an indefinite range and duration. Therefore, under *Ruiz*, plaintiffs cannot satisfy the affirmative act element of their state created danger claim as a matter of law.

Furthermore, the Court agrees with defendants that plaintiffs' § 1983 claim hinges not upon the re-certification, but upon defendants' failure to act upon information they either had or arguably should have had. At bottom, plaintiffs' claim is rooted in defendants' failure to respond to accusations of abuse by Lowe, their failure to check Lowe's criminal record prior to re-certifying her, and their failure to warn parents of Lowe's conduct. In short, plaintiffs' claim is fundamentally predicated upon defendants' failure to act. A failure to act is not an affirmative act. *Jones,* 438 F.3d at 691 (quoting *Cartwright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003)). For this additional reason, the Court finds plaintiffs cannot satisfy the affirmative act element of their state created danger claim as a matter of law. Having determined that plaintiffs are unable to demonstrate an affirmative act, the Court finds it is unnecessary to address the special danger and deliberate indifference elements of their state created danger claim.

In sum, plaintiffs cannot show that Lowe was a state actor. Moreover, plaintiffs cannot prevail on their state created danger claim because they are unable to demonstrate an affirmative act. In the absence of a viable constitutional claim, the individual defendants are entitled to qualified immunity with respect to plaintiffs' claims

against them in their individual capacities. Defendants are also entitled to summary judgment on plaintiffs' official capacity claim because plaintiffs cannot succeed on the merits of their § 1983 claim. For these reasons, defendants are entitled to summary judgment in their favor with respect to plaintiffs' claim under § 1983.

### C. State law claims

Having determined that defendants are entitled to summary judgment with respect to plaintiffs' federal claim, the Court declines to exercise jurisdiction over plaintiffs' state law wrongful death and survivorship claims. 28 U.S.C. § 1367(c)(3)); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). The Court will therefore remand plaintiff's state law claims to the Common Pleas Court at the conclusion of this case.

### IV. Disposition

Based on the above, the Court **GRANTS** defendants' summary judgment motion (Doc. 55). The Court **DISMISSES** plaintiff's § 1983 claim against Franklin County Commissioners Dewey Stokes, Arlene Shoemaker, Mary Jo Kilroy and Paula Brooks, the Franklin County Department of Jobs and Family Services, Mary Lou Langenhop, Christin LeMaster and Claudia Covington with prejudice.

The Court has determined as a matter of law that defendant Lowe was not a state actor. Plaintiffs' § 1983 claim against Lowe is therefore also dismissed with prejudice.

Plaintiffs have indicated they intend to dismiss the remaining Franklin County Children's Services ("FCCS") defendants. Pl. Mem. In Op. (Doc. 66) at I. Plaintiffs shall do so by **November 10, 2006.** Once plaintiffs dismiss these remaining

defendants, the Court will enter a final judgment remanding plaintiffs' state law claims to the Franklin County Court of Common Pleas.

The Clerk shall remove Doc. 55 from the Court's pending motions list.

**IT IS SO ORDERED.**

_____
Michael H. Watson, Judge
United States District Court